# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WILMINGTON SAVINGS FUND
SOCIETY, FSB, solely in its capacity as
successor Indenture Trustee for the 10%
Second Priority Senior Secured Notes
due 2018, on behalf of itself and
derivatively on behalf of CAESARS
ENTERTAINMENT OPERATING
COMPANY, INC.,

           Plaintiff,

      v.

CAESARS ENTERTAINMENT
CORPORATION, CAESARS GROWTH
PARTNERS, LLC, CAESARS
ACQUISITION COMPANY, CAESARS
ENTERTAINMENT RESORT
PROPERTIES, LLC, CAESARS
ENTERTAINMENT OPERATING
COMPANY, INC., CAESARS
ENTERPRISE SERVICES, LLC, ERIC
HESSION, GARY LOVEMAN,
JEFFREY D. BENJAMIN, DAVID
BONDERMAN, KELVIN L. DAVIS,
MARC C. ROWAN, DAVID B.
SAMBUR, and ERIC PRESS,

           Defendants,

    and

CAESARS ENTERTAINMENT
OPERATING COMPANY, INC.,

           Nominal Defendant.

C.A. No. 10004-VCG

# MEMORANDUM OPINION

Date Submitted: March 10, 2015
Date Decided: March 18, 2015

Martin S. Lessner, Richard J. Thomas, and Nicholas J. Rohrer, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Bruce Bennett, Sidley P. Levinson, and Joshua M. Mester, of JONES DAY, Los Angeles, California; Geoffrey Stewart, of JONES DAY, Washington, D.C.; Philip Le B. Douglas, Todd R. Geremia, and Rajeev Muttreja, of JONES DAY, New York, New York; and James Carr, Eric R. Wilson, and David Zalman, of KELLEY DRYE & WARREN LLP, New York, New York, *Attorneys for Plaintiff Wilmington Savings Fund Society, FSB, solely in its capacity as successor Indenture Trustee for the 10% Second Priority Senior Secured Notes due 2018.*

Kenneth J. Nachbar, William M. Lafferty, John P. DiTomo, and Lindsay M. Kwoka, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Eric Seiler, Philippe Adler, Emily A. Stubbs, and Jason C. Rubinstein, of FRIEDMAN KAPLAN SEILER & ADELMAN LLP, New York, New York, *Attorneys for Defendants Caesars Entertainment Corporation, Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Operating Company, Inc., Caesars Enterprise Services, LLC, Eric Hession, Gary Loveman, Jeffrey D. Benjamin, Marc C. Rowan, David B. Sambur, and Eric Press.*

Kenneth J. Nachbar, William M. Lafferty, John P. DiTomo, and Lindsay M. Kwoka, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Marc E. Kasowitz, David S. Rosner, Andrew K. Glenn, and Joshua M. Greenblatt, of KASOWITZ BENSON TORRES & FRIEDMAN LLP, New York, New York, *Attorneys for David Bonderman and Kelvin L. Davis.*

Andrew D. Cordo and Marie M. Degnan, of ASHBY & GEDDES, PA, Wilmington, Delaware; OF COUNSEL: Christopher Harris and Daniel D. Adams, of LATHAM & WATKINS LLP, New York, New York, *Attorneys for Defendants Caesars Growth Partners, LLC and Caesars Acquisition Company.*

**GLASSCOCK, Vice Chancellor**

On December 5, 2014, I heard oral argument on and took under advisement the Defendants' Motions to Dismiss or Stay the Verified Complaint in this action. Due to the Defendants' representations that they would imminently seek to enjoin this action by application in the related, parallel bankruptcy proceedings in the Northern District of Illinois Bankruptcy Court, I thought it most efficient to withhold consideration of the Defendants' Motions. However, as the Defendants had not yet sought application in the Bankruptcy Court to enjoin this action at the time of a status conference on March 10, 2015, I informed the parties that I would proceed with my consideration of the pending Motions.[1] For the reasons set forth below, I deny the Defendants' Motions to Dismiss or Stay.

## I. BACKGROUND FACTS

### A. Buyout and Debt Financing of Caesars

The facts underlying this dispute are extensive and complex, but, at this stage in the litigation, a brief adumbration is sufficient to resolve the Defendants' Motions.[2] Defendant Caesars Entertainment Corporation ("CEC") is "a Delaware corporation that, through subsidiaries, joint ventures and other arrangements, owns, operates, and manages gambling casinos and properties in the United States and

---

[1] Subsequently, the Defendants have informed me that Defendant Caesars Entertainment Operating Company, Inc. has filed an injunction motion in the Bankruptcy Court on March 11, 2015.

[2] Unless otherwise indicated, the facts provided herein are taken from the Plaintiff's Verified Complaint.

1

foreign countries."[3] In January 2008, Defendants Apollo Global Management, Inc. ("Apollo") and TPG Capital, LP ("TPG"), along with other co-investors, acquired CEC, including its then-"principal operating subsidiary" Defendant Caesars Entertainment Operating Company, Inc. ("CEOC," and together with CEC, "Caesars"), in a leveraged buyout priced at $30 billion.[4] CEOC "incurred most of the debt used to fund the buyout," and still owes approximately $19.3 billion of Caesar's total $25.3 billion outstanding long-term debt issued in the transaction.[5]

Following the buyout, CEOC engaged in a series of additional debt offerings. On December 24, 2008, CEOC issued, and CEC guaranteed, $214.8 million aggregate principal amount of 10.00% second priority senior secured notes due 2015 and $847.6 million aggregate principal amount of 10.00% second priority senior secured notes due 2018, pursuant to an indenture between CEC, CEOC, and U.S. Bank National Association ("US Bank") as trustee (the "2008 Indenture"). That same day, two other agreements relevant to the parties' dispute were executed: CEOC and its subsidiaries entered into a collateral agreement ("the Second Lien Collateral Agreement") granting liens on "substantially all of their assets" to secure their obligations under the 2008 Indenture;[6] and US Bank and

---

[3] Compl. ¶ 19.

[4] At the time of the merger, CEC and CEOC were known as "Harrah's Entertainment Inc." and "Harrah's Operating Company, Inc.," respectively. *Id.* ¶¶ 2–3. For the sake of clarity, I refer to these parties in past events by their present names.

[5] *Id.* ¶¶ 3, 37.

[6] *Id.* ¶ 44.

2

Bank of America, N.A. entered into an agreement defining "the relative rights of the Note-Holders and holders of more senior CEOC notes [(the "Senior Lenders")] with respect to the assets securing the Notes" (the "Intercreditor Agreement").[7]

On April 15, 2009, CEOC additionally issued, and CEC guaranteed, $3.71 billion aggregate principal amount of 10.00% second priority senior secured notes due 2018, pursuant to an indenture between CEC, CEOC, and US Bank (the "2009 Indenture"); these notes were secured by liens on "substantially all of CEOC's assets and certain of its subsidiaries' assets pursuant to the Second Lien Collateral Agreement."[8] That same day, US Bank executed the Joinder and Supplement to Intercreditor Agreement, subjecting its rights under the 2009 Indenture to the Intercreditor Agreement.[9] Plaintiff Wilmington Savings Fund Society, FSB ("WSFS") is the successor trustee of US Bank; WSFS has not asserted that it is not bound by the 2009 Indenture and the Intercreditor Agreement, and I assume for purposes of this Memorandum Opinion that it is so bound.[10]

On April 16, 2010, CEOC additionally issued, and CEC guaranteed, $750 million aggregate principal amount of 12.75% second priority senior secured notes due 2018, pursuant to an indenture between CEC, CEOC, and US Bank (the "2010

---

[7] Defs.' Opening Br. in Supp. of Mot. to Dismiss or Stay at 13–14.
[8] Compl. ¶ 45.
[9] *See* DiTomo Aff. Ex. E (Joinder and Supplement to Intercreditor Agreement).
[10] Both the 2009 Indenture and the Intercreditor Agreement provide that the parties' successors are bound by the respective agreement and define "Trustee" to include successors. *See* DiTomo Aff. Ex. A (2009 Indenture) §§ 1.01, 13.11; DiTomo Aff. Ex. B (Intercreditor Agreement) §§ 1.1, 8.11.

Indenture"); these notes "are also secured by liens against substantially all of CEOC's and certain of its subsidiaries' assets pursuant to the Second Lien Collateral Agreement."[11]

*B. CEOC's Insolvency and Asset Sell-Off*

The Plaintiff alleges that in the period from 2008 to 2010, while CEOC was continuing to burden itself with additional debt, Caesars was simultaneously experiencing plummeting revenue brought on by the 2008 financial crisis. Beginning only months after Apollo and TPG's buyout of Caesars, the financial crisis had a devastating effect on the gaming industry in general, but its forces were particularly catastrophic when they reached a debt-ridden CEOC; the Plaintiff explains that "the global financial crisis and ensuing recession crippled Caesars' business" and hit CEOC especially hard "as revenues at its casinos needed to service its debt fell dramatically."[12]

In response to CEOC's "unsustainable capital structure" brought on by the recession, Apollo and TPG initially attempted to relieve the pressure of CEOC's indebtedness through amending credit facility agreements and offering debt exchanges. However, the Plaintiff alleges that in 2010, when CEOC's financial troubles persisted, Apollo and TPG began resorting to selling off CEOC's assets to other CEC subsidiaries, "strip[ping] CEOC of valuable assets" such that those

---

[11] Compl. ¶ 46.
[12] *Id.* ¶ 5.

4

assets would be unreachable by CEOC's creditors.[13] The Plaintiff asserts that TPG and Apollo's efforts to hide CEOC's assets continued into 2010, even after the economy and gaming industry showed signs of recovery, because "CEOC, still burdened by almost $20 billion of acquisition debt, continued to generate significant operating losses."[14]

In 2013, TPG and Apollo, "[f]aced with the prospect that CEOC would be unable to repay its massive debt," allegedly upped the ante on their asset-transfer scheme and began "to remove CEOC's most valuable assets from the reach of its creditors, and to transfer them to two affiliates not liable for CEOC's debt"— Defendants Caesars Entertainment Resort Properties, LLC ("Resort Properties") and Caesars Growth Partners, LLC ("Growth Partners"). The Plaintiff asserts that, from September 2013 through March 2014, Apollo and TPG caused CEOC to transfer to Resort Properties and Growth Partners a portfolio of key assets for below-market consideration, including casinos and developments in Las Vegas, Baltimore, and New Orleans; management fees payable from those properties; and, CEOC's most valuable asset, the data and intellectual property that comprises a "sophisticated customer loyalty and data-gathering/marketing system" known as

---

[13] *Id.* ¶ 6.
[14] *Id.* ¶ 7.

the Total Rewards Program.[15]   The Plaintiff describes the outcome of the

Defendants' alleged shell game as follows:

> The net effect of the transactions described above has been to divide
> Caesars into two segments—one, a "Good Caesars," consisting of
> Growth Partners and Resort Properties that owns the prime assets
> formerly belonging to CEOC, and the other, a "Bad Caesars,"
> consisting of CEOC which remains burdened by substantial debt . . . .
> Only the "Bad Caesars" remains liable for the vast majority of the
> debts incurred in the 2008 buyout transaction.  Thus, [Apollo, TPG,]
> and CEC have sought to deprive CEOC's lenders and creditors of the
> ability to seek recourse against CEOC's most valuable assets when
> CEOC inevitably defaults on its debts as they come due.[16]

*C. Procedural History*

On August 4, 2014, the Plaintiff, as successor trustee of the 2009 Indenture,

filed its Verified Complaint in this Court against entities and individuals that the

Plaintiff alleges were involved in wrongfully hiding CEOC's assets from its

creditors, including Apollo, TPG, CEC, Growth Partners, Resort Properties, and

various directors, officers, and partners at CEC, CEOC, Apollo, and TPG.  The

Plaintiff alleges that these Defendants' actions violated terms of the 2009 Indenture

as well as fiduciary duties owed to CEOC's creditors.  The Complaint asserts

claims, directly on behalf of Plaintiff and derivatively on behalf of Nominal

Defendant CEOC, for breach of contract, declaratory relief, fraudulent transfer,

---

[15] *Id.* ¶¶ 8–10, 50.
[16] *Id.* ¶ 11.

6

breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and corporate waste.

On August 5, 2014, Caesars filed a complaint in the Supreme Court of the State of New York, New York County, against certain holders of CEOC's second priority notes and one holder of CEOC's first priority notes (the "New York Action"), in which Caesars casts its creditors' fraud allegations against Caesars as baseless and part of a nefarious scheme to cash out on credit default swaps by driving CEOC to default on its loans.[17] The Plaintiff was not originally a named defendant in the New York Action, but Caesars amended and supplemented its complaint on September 14, 2014 to, among other things, add WSFS as a defendant.[18] In the New York Action, Caesars seeks, among other things, a judicial declaration that Caesars has not defaulted under its various indenture agreements with its creditors, and that Caesars or its directors have not breached their fiduciary duties, engaged in any fraudulent transfer, or otherwise engaged in any violation of law.[19]

On September 23, 2014, the Defendants moved to dismiss or stay the Plaintiff's Complaint in this action under Court of Chancery Rule 12(b)(3), alleging that the Plaintiff had contractually agreed to New York as the exclusive

---

[17] *See, e.g.*, DiTomo Aff. Ex. C (original complaint in New York Action) ¶¶ 1–6.
[18] *See* DiTomo Aff. Ex. D (amended and supplemental complaint in New York Action).
[19] *Id.*, Prayer for Relief.

forum for hearing this dispute or, in the alternative, that New York was the appropriate forum under the *forum non conveniens* doctrine. I heard oral argument on the Defendants' Motions on December 5, 2014.

Following oral argument, the Defendants informed me that CEOC had entered into a financial restructuring agreement with certain of its first priority lienholders on December 19, 2014, that CEOC planned to voluntarily commence Chapter 11 bankruptcy on January 15, 2015, and that such bankruptcy would automatically stay this action. On January 12, 2015, the Plaintiff informed me that certain second priority lienholders had filed an involuntary bankruptcy petition against CEOC in the United States Bankruptcy Court for the District of Delaware, that such bankruptcy automatically stays this action against CEOC, but that such bankruptcy did not stay this action against CEC. I held a status conference with the parties on January 13, 2015, during which the Defendants represented that CEOC would imminently commence its voluntary bankruptcy and move in those proceedings to enjoin the entirety of this action. On January 15, 2015, the Defendants informed me that CEOC had voluntarily filed its bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois.

After a series of additional letters from the parties in February and early March, informing me of updates in the New York Action and bankruptcy proceedings, I held an additional status conference with the parties on March 10,

2015, during which the Defendants represented that, though it still intended to do so, CEOC had not yet moved to enjoin this action in the Bankruptcy Court.[20] At that time, I informed the parties that I would proceed with my consideration of the Defendants' pending Motions.

### D. The Contract Provisions

The 2009 Indenture, which governs the relationship between the Plaintiff and the Caesars Defendants, selects New York law as the applicable law but does not include a forum selection clause.[21] The 2009 Indenture does in multiple places, however, indicate that the parties' rights and obligations under the 2009 Indenture are subject to another agreement—the Intercreditor Agreement—which does include an exclusive forum selection clause. In detailing the Plaintiff's right to bring legal action to protect its interest under the debt arrangement, for instance, the 2009 Indenture states that:

> *Subject to the Intercreditor Agreement*, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the Second Priority Liens or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem

---

[20] In a letter dated March 12, 2015, the Defendants notified me that CEOC had filed an application in the Bankruptcy Court the previous day to stay or enjoin this action in its entirety.
[21] DiTomo Aff. Ex. A (2009 Indenture) § 13.09.

9

expedient to preserve or protect its interests and the interests of the holders of Notes in the Collateral . . . .[22]

In addition, in the miscellaneous provisions of the 2009 Indenture, Section 13.16 provides, without elaboration, that "[t]he terms of this Indenture are subject to the terms of the Intercreditor Agreement."[23]

The Intercreditor Agreement, in turn, expressly includes a forum selection clause, which is bifurcated into exclusive and nonexclusive clauses. In Section 8.7, the Intercreditor Agreement provides:

> The parties hereto consent to the *nonexclusive* jurisdiction of any state or federal court located in New York County, New York (the "New York Courts") . . . . *Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this agreement in the courts of any jurisdiction, except that each Second Priority Secured Party and each Second Priority Agent agrees that (a) it will not bring any such action or proceeding in any court other than New York Courts, and (b) in any such action or proceeding brought against any Second Priority Agent or any Grantor or any Second Priority Secured Party in any other court, it will not assert any cross-claim, counterclaim or setoff, or seek any other affirmative relief,* except to the extent that the failure to assert the same will preclude such Second Priority Secured Party from asserting or seeking the same in New York Courts.[24]

The Intercreditor Agreement, by its terms, and as its name suggests, is an agreement among CEOC's creditors, solely to establish priority among those

---

[22] *Id.* § 11.03 (emphasis added).
[23] *Id.* § 13.16.
[24] DiTomo Aff. Ex. B (Intercreditor Agreement) § 8.7 (emphasis added).

10

creditors;[25] neither CEOC nor CEC is a party to the Intercreditor Agreement. Section 8.16 of the Intercreditor Agreement explicitly states that, besides signatories and their successors and assigns, "[n]o other Person shall have or be entitled to assert rights or benefits hereunder," but that "[n]otwithstanding the foregoing, [CEOC] is an intended beneficiary and third party beneficiary hereof with the right and power to enforce with respect to Sections 5.1, 5.3, 5.7, 8.3, 8.16 and 8.22 and Article VI hereof and as otherwise provided herein."[26] Notably, CEOC's rights under Section 8.16 do not include the right to enforce the forum selection clause, Section 8.7. Both CEOC and CEC executed a consent and acknowledgement of their limited rights with regards to the Intercreditor Agreement contemporaneous with that agreement's execution.[27]

## II. STANDARD OF REVIEW

"Courts traditionally dismiss a matter under Rule 12(b)(3) when the contract underlying the dispute contains an explicit forum selection clause or when, applying the doctrine of *forum non conveniens*, Delaware is clearly not the appropriate forum for litigation."[28]

---

[25] *See, e.g., id.* § 2.4 ("The provisions of this Agreement are intended solely to govern the respective Lien priorities as between the Senior Lenders and the Second Priority Secured Parties . . . .").

[26] *Id.* § 8.16.

[27] *See id.*, Acknowledgement of Intercreditor Agreement (following signature pages).

[28] *Lefkowitz v. HWF Holdings, LLC*, 2009 WL 3806299, at *3 (Del. Ch. Nov. 13, 2009) (footnote omitted).

11

## III. ANALYSIS

*A. Forum Selection Clause*

I first turn to the issue of whether the Plaintiff is prevented from bringing this action in Delaware by the operation of an exclusive forum selection clause. In order to dismiss the Plaintiff's Complaint due to a forum selection clause, I must find that the Plaintiff, in the contract at issue, clearly and unambiguously agreed to bring its claims exclusively in a foreign jurisdiction.[29]

As mentioned above, the 2009 Indenture—the agreement governing the debtor/creditor relationship between WSFS and Caesars—does not include a forum selection clause.[30] Nevertheless, the Defendants argue that the Plaintiff clearly

---

[29] As a preliminary matter, I note that there is an underlying issue of whether Delaware or New York law applies to the question of whether the parties have eschewed litigation in this forum by contract. In briefing, the parties cite Delaware cases concerning the enforceability of an exclusive forum selection clause, but the contract itself—the 2009 Indenture—selects New York law as the law governing the contract. It is not necessary for me to resolve this choice-of-law question, though, as the Defendants represented at oral argument that the standard governing the enforceability of an exclusive forum selection clause is the same in Delaware and New York— the exclusive forum selection clause must be clear and unambiguous. *See* Oral Arg. Tr. 17:9– 19:12. *Compare, e.g., British W. Indies Guar. Trust Co., Ltd. V. Banque Internationale a Luxembourg*, 567 N.Y.S.2d 731, 732 (N.Y. App. Div. 1991) (enforcing an exclusive forum selection clause where "[t]he contractual provision in this case, designating Luxembourg as the venue for any disputes, is clear and unambiguous"), *with Scanbuy, Inc. v. NeoMedia Tech., Inc.*, 2014 WL 5500245, at *2 (Del. Ch. Oc. 31, 2014) ("'The courts of Delaware defer to forum selection clauses' and grant Rule 12(b)(3) motions to dismiss 'where the parties use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action.'" (internal quotation marks omitted) (quoting *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010))), *and Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007) ("If the contractual language is not crystalline, a court will not interpret a forum selection clause to indicate the parties intended to make jurisdiction exclusive." (internal quotation marks omitted)).

[30] As noted above, however, the 2009 Indenture does include a choice-of-law provision. *See* DiTomo Aff. Ex. A (2009 Indenture) § 13.09 (providing that New York law governs).

12

chose New York as the exclusive forum for hearing disputes arising out of the 2009 Indenture because the 2009 Indenture incorporates the terms of the Intercreditor Agreement, including the exclusive forum selection clause found in Section 8.7 of the Intercreditor Agreement. The Defendants point to two provisions of the 2009 Indenture in support of this contention. First, Section 13.16 of the 2009 Indenture generally states that "[t]he terms of this Indenture are subject to the terms of the Intercreditor Agreement."[31] Second, Section 11.03 specifically provides that the Plaintiff's ability to bring actions to enforce the Second Priority Lien or remedy violations of the 2009 Indenture is "[s]ubject to the Intercreditor Agreement."[32] The Defendants argue that these provisions incorporate into the 2009 Indenture the Plaintiff's obligations under the forum selection clause in Section 8.7 of the Intercreditor Agreement, which states in relevant part that "each Second Priority Secured Party and each Second Priority Agent agrees that . . . it will not bring any such action or proceeding"—that is, an action or proceeding "relating to" the Intercreditor Agreement—"in any court other than New York Courts."[33]

I do not find that the provisions of the 2009 Indenture and the Intercreditor Agreement, taken together, indicate a clear and unambiguous choice by the

_____

[31] *Id.* §13.16.
[32] *Id.* §11.03.
[33] DiTomo Aff. Ex. B (Intercreditor Agreement) § 8.7.

13

Plaintiff to exclusively litigate this action in New York. Even assuming that Section 13.16 of the 2009 Indenture was intended to incorporate *all* the provisions of the Intercreditor Agreement into the 2009 Indenture, and not just resolve any conflicting provisions between the two agreements, the forum selection clause found in Section 8.7 of the Intercreditor Agreement does not clearly cover the dispute here. The forum selection clause in the Intercreditor Agreement is limited by its terms to actions "relating to" the Intercreditor Agreement—a contract that establishes rights and obligations among the various priority level creditors.[34] This action does not concern the priority rights and obligations among CEOC's creditors, but rather WSFS's direct recourse against entities and individuals connected to Caesars charged with shifting CEOC's assets out of WSFS's reach.

In an attempt to demonstrate that a broad universe of claims falls under the Intercreditor Agreement's forum selection clause, a universe that includes this action, the Defendants cite the language "relating to" as evidence that the parties intended this to be a broad jurisdictional provision, but upon a careful reading I do not agree. The forum selection clause in Section 8.7 operates first by establishing the parties' rights to bring an action relating to the Agreement in "any jurisdiction," and then restricts those rights in the limited circumstance where a

---

[34] *See, e.g.*, *id.* § 2.4 ("The provisions of this Agreement are intended *solely* to govern the respective Lien priorities as between the Senior Lenders and the Second Priority Secured Parties . . . ." (emphasis added)); *id.* at 1 (recitals to Intercreditor Agreement).

Second Priority Secured Party or Second Priority Secured Agent initiates the action. I read this provision as a narrow, not broad, clause. Such a narrow interpretation finds additional support in the broader context of the Intercreditor Agreement, which is an agreement that is largely meant to establish protections of the Senior Lenders against the Second Priority Secured Parties. The narrow forum selection clause in Section 8.7 is meant as a further protection for the Senior Lenders by limiting to New York the venues in which they are subject to litigation concerning priority by the Second Priority Secured Parties. Thus, while the Defendants may be correct that the phrase "relating to" is broad enough to bring under the forum selection clause non-contractual claims, the universe of those non-contractual claims is limited to related disputes between the various creditors and does not clearly extend in this situation to parties and contracts outside the Intercreditor Agreement.[35] In other words, the language of the Intercreditor Agreement, even if imported into the 2009 Indenture, does not amount to a clear

---

[35] In a footnote to their Opening Brief, and more plainly at Oral Argument, the Defendants contended that Section 3.1(a) of the Intercreditor Agreement limits the ability of Second Priority Secured Parties or Agents to exercise rights or remedies relating to "Common Collateral" when the Senior Lenders' claims have not yet been discharged. *See* Defs.' Br. in Supp. of Mot. to Dismiss or Stay at 19 n.14; Oral Arg. Tr. 26:9–29:7. The Defendants therefore argue that this suit is in breach of that provision of the Intercreditor Agreement, and thus *must* "relate to" the Intercreditor Agreement, thereby invoking the New York forum selection clause of that contract, which in turn is imported into the 2009 Indenture by its 'governed-by" provisions. This is an interesting and lawyerly argument, and demonstrates why, to be an enforceable waiver by a contracting party plaintiff of her right to choose a forum, the contact language must be clear and unambiguous.

selection in the latter of an exclusive New York forum for litigation of the claims here.

Similarly, while Section 11.03 of the 2009 Indenture—relating specifically to the trustee's right to bring an action to protect the collateral—is also made "subject to" the Intercreditor Agreement, it does not clearly invoke the exclusive forum selection clause; rather, Section 11.03 operates such that the trustee's right to sue to enforce the terms of the 2009 Indenture is subject to the superior creditor status of the first priority lienholders.[36] This provision does not clearly indicate that the Defendants can bind the Plaintiff to the exclusive forum selection clause in the Intercreditor Agreement. In fact, the Intercreditor Agreement expressly provides that Caesars holds the right and power to enforce certain provisions only—the exclusive forum selection clause is not among those.[37]

---

[36] *See, e.g.*, DiTomo Aff. Ex. B (Intercreditor Agreement) § 2.2 ("Each Second Priority Agent, for itself and on behalf of each applicable Second Priority Secured Party, and each First Lien Agent, for itself and on behalf of each Senior Lender in respect of which it serves as First Lien Agent, agrees that it shall not (and hereby waives any right to) take any action to challenge, contest or support any other Person in contesting or challenging, directly or indirectly, in any proceeding . . . , the validity, perfection, priority or enforceability of (a) a Lien securing any Senior Lender Claim . . . or (b) a Lien securing any Second Priority Claims . . . ; provided, however, that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Agent or any Senior Lender to enforce this Agreement . . . or any of the Senior Lender Documents.").

[37] *Id.* § 8.16. Additionally, in the Acknowledgement of Intercreditor Agreement, CEOC expressly stated that it

> understands that it is not an intended beneficiary or third party beneficiary of the foregoing Agreement except that it is an intended beneficiary and third party beneficiary thereof with the right and power to enforce with respect to Sections 5.1, 5.3, 5.7, 8.3, 8.16 and 8.22 and Article VI thereof and as otherwise provided therein.

16

*B. Forum Non Conveniens*

I turn next to the Defendants' argument that this dispute should be heard in New York under the doctrine of *forum non conveniens*. The Plaintiff urges me to find this action first-filed, and to analyze it under the doctrine set forth in *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*, known as the "first-filed rule," under which "as a general rule, litigation should be confined to the forum in which it is first commenced."[38] When, instead, actions are filed in different courts contemporaneously, this Court instead undertakes a traditional *forum non conveniens* analysis.[39] In this case, the New York Action was filed approximately 12 hours after the Complaint I have before me, and arises from the same nucleus of fact as the present action. Although the complaint in the New York Action was not amended until five weeks later to include WSFS, which is the Plaintiff in this action, I will assume for the purposes of this analysis that the actions were contemporaneous, and thus, a traditional *forum non conveniens* analysis applies.

The doctrine of *forum non conveniens*, properly applied, involves a wholesome balancing between the strong interest of a plaintiff in choosing the appropriate forum in which to bring her action, and the interest of the other

*See id.*, Acknowledgement of Intercreditor Agreement (following signature pages).
[38] 263 A.2d 281, 283 (Del. 1970).
[39] *See, e.g., In re Bear Stearns Cos., Inc. S'holder Litig.*, 2008 WL 959992, at *5 (Del. Ch. Apr. 9, 2008).

17

litigants and the court in an efficient and just resolution of the issues, together with principals of comity.[40] Courts in this State have traditionally applied the doctrine sparingly, with due regard for the Plaintiff's right to choose.[41] Recently, our Supreme Court in *Martinez v. E.I. Dupont de Nemours and Co., Inc.* emphasized that the concerns of justice, efficiency, and comity were also not to be regarded lightly.[42] My consideration of the Motions to Dismiss or Stay on *forum non conveniens* grounds is made in light of that teaching.

---

[40] *See, e.g., Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 429 (2007) ("Dismissal for *forum non conveniens* reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." (internal quotation marks and citation omitted)); *General Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681, 685 (Del. 1964) ("The matter [of dismissal based on *forum non conveniens*] is one to be determined as a discretionary act in the light of all the facts and circumstances and in the interest of expeditious and economic administration of justice."); *Hamilton Partners, L.P. v. England*, 11 A.3d 1180, 1212 (Del. Ch. 2010) ("'When a state court with little legitimate interest in a matter purports to speak on a subject of importance to a sister state, the reliability of state law is undermined and a counterproductive incentive is created for all state courts to afford less than ideal respect to each other.' The doctrine of *forum non conveniens* provides the primary vehicle through which courts apply the doctrine of comity." (quoting *Third Ave. Trust v. MBIA Ins. Corp.*, 2009 WL 3465985, at *1 (Del. Ch. Oct. 28, 2009))).

[41] *See, e.g., Friedman v. Alcatel Alsthom*, 752 A.2d 544, 552 (Del. Ch. 1999) (interpreting our Supreme Court's preceding jurisprudence on *forum non conveniens*, including the Court's guidance that "only in a rare case should a plaintiff's choice of forum be defeated in favor of a later-filed action in another jurisdiction," to indicate that, "[d]espite occasional references to the trial courts' discretion, little room for exercising that discretion exists" (quoting *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. P'ship*, 669 A.2d 104, 107 (Del. 1995))).

[42] *See* 86 A.3d 1102, 1106–11 (Del. 2014) ("[A]lthough the overwhelming hardship standard is stringent, it is not preclusive. Accordingly, in deciding *forum non conveniens* motions to dismiss, Delaware trial judges must decide whether the defendants have shown that the *forum non conveniens* factors weigh so overwhelmingly in their favor that dismissal of the Delaware litigation is required to avoid undue hardship and inconvenience to them. . . . [W]e conclude, based on the evolution of our case law and insights gleaned from that experience, that some prior decisions gave inadequate weight to the discretionary power of the trial courts to recognize the *Cryo-Maid* factor implicated here—the importance of the right of all parties (not only plaintiffs) to have important, uncertain questions of law decided by the courts whose law is at stake; and to

18

The *forum non conveniens* factors, often referred to as the "*Cryo-Maid* factors"[43] are:

> (1) the applicability of Delaware law, (2) the relative ease of access to proof, (3) the availability of compulsory process for witnesses, (4) the pendency or non-pendency of a similar action or actions in another jurisdiction, (5) the possibility of a need to view the premises, and (6) all other practical considerations that would make the trial easy, expeditious, and inexpensive.[44]

Delaware courts are deferential to a plaintiff's choice of forum. In the case of a motion to dismiss on grounds of *forum non conveniens*, our Supreme Court has held that a moving defendant, in light of all the factors above, must show an "overwhelming hardship" if the case were to be litigated in Delaware.[45] *Martinez* makes clear that, despite its preclusive-sounding appellation, the "overwhelming hardship" standard is not insurmountable; it is more properly perceived as requiring a finding that, on balance, litigation in Delaware would represent a manifest hardship to the defendants, "a stringent standard that holds defendants who seek to deprive a plaintiff of her chosen forum to an appropriately high burden."[46] Given this rather formidable standard, it is rare for this Court to dismiss

---

the reality that plaintiffs who are not residents of Delaware, whose injuries did not take place in Delaware, and whose claims are not governed by Delaware law have a less substantial interest in having their claims adjudicated in Delaware." (footnotes omitted)).

[43] *See Cryo-Maid*, 198 A.2d at 684 (setting forth *forum non conveniens* factors).

[44] *In re Bear Stearns Cos., Inc. S'holder Litig.*, 2008 WL 959992, at *5 (Del. Ch. Apr. 9, 2008).

[45] *See, e.g., Berger v. Intelident Solutions, Inc.*, 906 A.2d 134, 135 (Del. 2006); *Ison v. E.I. DuPont de Nemours and Co., Inc.*, 729 A.2d 832, 838 (Del. 1999).

[46] *Martinez*, 86 A.3d at 1105.

or stay an action on the grounds of *forum non conveniens*.[47] I now consider the *Cryo-Maid* factors in light of the standard.

I turn first to the applicability of Delaware law. While the 2009 Indenture is governed by New York law, the Plaintiff has also brought claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and corporate waste, which the parties agree are all governed by Delaware law.[48] The Plaintiff has also invoked Delaware law for its two fraudulent transfer claims. The Defendants argue that the fiduciary-duty claims are makeweights, and that New York law will predominate in this action.[49] Assuming for purposes of these Motions that such is the case, I nonetheless do not find the applicability of New York law particularly persuasive here. This Court is often called upon to apply New York law to resolve commercial disputes. If it could be persuasively argued that novel issues of New York law, properly within the purview of the courts of that State, were presented, considerations of comity between the jurisdictions might lend this factor more weight, but that does not appear to be the case here.

---

[47] *See, e.g., Ison v. E.I. DuPont de Nemours and Co., Inc.*, 729 A.2d 832, 838 (Del. 1999) ("A plaintiff's choice of forum should not be defeated except in the rare case where the defendant establishes, through the Cryo-Maid factors, overwhelming hardship and inconvenience." (quoting *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. P'ship*, 669 A.2d 104, 105 (Del. 1995))); *Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1198 (Del. 1997) ("Delaware courts consistently uphold a plaintiff's choice of forum except in rare cases.").

[48] *See* Oral Arg. Tr. 20:8–13; Defs.' Opening Br. in Supp. of Mot. to Dismiss or Stay at 27.

[49] *See* Oral Arg. Tr. 20:14–16; Defs.' Opening Br. in Supp. of Mot. to Dismiss or Stay at 27.

20

Next, the Defendants do not dispute the availability of compulsory process for witnesses, but, overlapping with the ease of access to proof factor, point out that the individual parties do not live and work in Delaware and that the corporate entities all maintain their principal place of business outside of Delaware, with the exception of the Plaintiff.[50] The Plaintiff responds that it has subpoenaed at least six witnesses who may be subject to New York jurisdiction, each of whom can be compelled to testify here as well.[51] I find that the second and third *Cryo-Maid* factors do not weigh heavily in favor of granting the Motions on grounds of *forum non conveniens*.

As to pendency of similar actions in another jurisdiction, I note that there is the pending, near-contemporaneously filed New York Action arising from the same nucleus of facts as this dispute. It is clear, though, that both the Supreme Court of the State of New York and this Court can provide complete relief here. While two parallel actions are not ideal, and raise typical concerns of inefficiency and inconsistent judgments, there is no doubt that a resolution of the issues here would result in a final judgment enforceable against the parties, and the pendency of the New York Action is not highly persuasive on *forum non conveniens* grounds.

---

[50] Defs.' Opening Br. in Supp. of Mot. to Dismiss or Stay at 28.
[51] Pl.'s Opposition to Defs.' Mots. to Dismiss or Stay the Verified Compl. at 35.

21

Finally,[52] under *Cryo-Maid,* I am to consider "all other practical considerations that would make the trial easy, expeditious, and inexpensive."[53] The Defendants argue that this factor weighs in favor of New York; they assert that the majority of relevant parties and witnesses are located in that jurisdiction. I assume that is the case. I take judicial notice, however, that the Courthouse in Wilmington is separated from Pennsylvania Station in Manhattan by a five-minute walk and 125 miles of shiny steel rails, which may be traversed in the comfort of the business section of an Acela train in an hour and a half. In that light, litigation in Delaware is less manifest hardship than inconvenience. The *Cryo-Maid* factors, taken together, do not support dismissal or stay of this matter.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss or Stay are denied. An appropriate order accompanies this Memorandum Opinion.

---

[52] The parties do not suggest that the fifth *Cryo-Maid* factor—the ability to view the premises— is a relevant factor in this case.

[53] *In re Bear Stearns Cos., Inc. S'holder Litig.,* 2008 WL 959992, at *5 (Del. Ch. Apr. 9, 2008).

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WILMINGTON SAVINGS FUND
SOCIETY, FSB, solely in its capacity as
successor Indenture Trustee for the 10%
Second Priority Senior Secured Notes
due 2018, on behalf of itself and
derivatively on behalf of CAESARS
ENTERTAINMENT OPERATING
COMPANY, INC.,

        Plaintiff,

     v.

CAESARS ENTERTAINMENT
CORPORATION, CAESARS GROWTH
PARTNERS, LLC, CAESARS
ACQUISITION COMPANY, CAESARS
ENTERTAINMENT RESORT
PROPERTIES, LLC, CAESARS
ENTERTAINMENT OPERATING
COMPANY, INC., CAESARS
ENTERPRISE SERVICES, LLC, ERIC
HESSION, GARY LOVEMAN,
JEFFREY D. BENJAMIN, DAVID
BONDERMAN, KELVIN L. DAVIS,
MARC C. ROWAN, DAVID B.
SAMBUR, and ERIC PRESS,

        Defendants,

   and

CAESARS ENTERTAINMENT
OPERATING COMPANY, INC.,

        Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
) C.A. No. 10004-VCG
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## ORDER

AND NOW, this 18th day of March, 2015,

The Court having considered the Defendants' Motions to Dismiss or Stay, and for the reasons set forth in the Memorandum Opinion dated March 18, 2015, IT IS HEREBY ORDERED that the Defendants' Motions are DENIED.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor